death of both his sons, and the contingency of the death of one presented itself to his mind. What would happen then? His testamentary intent suggested the answer, and that was that one-half of the estate would immediately vest in the descendants of the son so dying; as to that half the trust would terminate, and half the property would become alienable, and the whole subject to sale in partition. This was contrary to his desire, and to avoid this result he provided that:

"In case of the death of either said John A. G. or Samuel P. *then his share* (one-half) of the income or profits shall be paid to the heirs of such descendant until the death of the survivor of my said two sons. \* \* \*"

This method of keeping the estate intact as long as possible shows the testator's idea of what would, except for this provision, happen on the death of one of his sons. The descendants of the one first dying would have taken the title in fee to one-half the trust fund; but instead, for the purpose solely of keeping the estate intact, for which the existence of the annuities furnished a strong motive, they were given the income only until the death of the other son, and the enjoyment of the principal was postponed until that event. The words in parenthesis, "(one-half)," show the testator's conception that the interests of his two sons were several and not joint. The descendants of the two sons, therefore, take the remainder per stirpes, and not per capita.

I have passed on the requests to find presented by the guardian of the infant Samuel P. Barker, and have indicated my disposition of plaintiff's findings in the margin. Let plaintiff present a fair copy of findings to carry out the decision, and settle the same, and also the judgment, on notice.

(170 App. Div. 429)

PEOPLE ex rel. LONG ISLAND R. CO. v. PUBLIC SERVICE COMMISSION OF NEW YORK FOR FIRST DIST. et al.

(Supreme Court, Appellate Division, First Department. December 10, 1915.)

1. RAILROADS &—51—CONNECTIONS WITH OTHER ROADS—REGULATION—POW-
     ER OF COMMISSION.

      Under Public Service Commissions Law (Consol. Laws, c. 48) § 27, giving the Public Service Commission power, upon application of a shipper, to order the installation of a connection with a lateral line of railroad or side track, it is beyond the power of the Commission to order the building of an elevated side track to the shipper's plant, that being more than a physical connection and extending beyond the property of the railroad; nor can the act of the Commission in ordering the building of such a side track be sustained under section 4 of the law, providing that the commission shall have all powers necessary or proper to enable it to carry out the purposes of the chapter.

      [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. &—51.]

2. RAILROADS &—51—CONNECTIONS WITH LATERAL ROADS—FEASIBILITY—EVI-
     DENCE.

      Evidence that a switch connection with a lateral road, ordered by the Public Service Commission, would necessarily be elevated, and would involve difficulties in construction and a greater expense than a grade

connection, *held* not to warrant a reversal of the order on the ground that it is not feasible or practicable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. ☞51.]

3. RAILROADS ☞51—CONNECTIONS WITH OTHER ROADS—PRIVATE CONNECTIONS.

Public Service Commissions Law, § 27, authorizing the Public Service Commission to order the installation of track connections with lateral lines, is not unconstitutional, as creating a private use, where, while the use may temporarily be private, the track so connected may be used for public purposes.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. ☞51.]

4. RAILROADS ☞51—CONNECTIONS WITH OTHER ROADS—WHEN REQUIRED— "PUBLIC USE."

Where the persons petitioning for the installation of a track connection with a lateral line received, stored, sold, and shipped products of others, and, although they were the only ones using the connection, others might have used it when the necessity arose, the use was not private, but public.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. ☞51.

For other definitions, see Words and Phrases, First and Second Series, Public Use.]

5. RAILROADS ☞51—CONNECTIONS WITH OTHER ROADS—REGULATION—POWER OF COMMISSION.

Under Public Service Commissions Law, § 27, authorizing the Public Service Commission to order the installation of track connections with lateral lines, the Commission has no authority to require the railroad to obtain a permit from public authorities for the construction of a siding without the line of its property.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. ☞51.]

Certiorari by the People, on the relation of the Long Island Railroad Company, against the Public Service Commission of the State of New York for the First District and others, to review an order of said Commission. Order annulled, and cause remanded.

Writ of certiorari to review the action of the Public Service Commission in ordering the relator to make a switch connection with a lateral line of railroad or private side track at Jamaica, Long Island. Prior to the year 1897, the petitioners conducted a wholesale and retail grocery, grain, and produce business at Jamaica on the southerly side of the railroad of the relator, with a siding connection from the relator's railroad to their two warehouses. In the year 1896 they contemplated constructing a larger plant. The principal business between them and their customers required the use of the grade crossing of the relator's tracks on Rockaway road. This was objectionable to the relator, and on its coming to the attention of the relator that the petitioners contemplated building in the same vicinity, a representative of the relator suggested to the petitioners that they transfer part of their business to the northerly side of the tracks, and represented that the relator contemplated changing the location of its permanent freight yard to that side. The petitioners evidently acquiesced in this suggestion, for they acquired the land bounding northerly on Fulton street, now Jamaica avenue, 78 feet, westerly on Tyndall street, now Brantford road, from Fulton street to Archer place, and southerly on Archer place from 85 to 90 feet, and also a strip 2 feet wide on the westerly side of Tyndall street, extending from Fulton street to Archer place, and bounding on the west by lands of the relator, where it was to and did construct and operate its permanent freight yard for a time, and

also land extending from Archer place to the premises of the relator on the south, and bounded on the west by lands of the relator, and extending easterly therefrom 160 feet. At that time Archer place was a mere cul de sac, extending from Tyndall street easterly to a point about 150 feet west of Rockaway road. It thus appears that Tyndall street and Archer place extended in the form of the letter L from Fulton street southerly and easterly, and the petitioners owned land abutting on each side of both and extending to lands owned by the relator on the west and south. There is no evidence with respect to the ownership of the fee of Archer place at that time.

In the year 1897, after the petitioners acquired this land, the relator, pursuant to a contract in writing between it and the petitioners, constructed a siding from its railroad diagonally across the junction of Tyndall street and Archer place onto the petitioners' land, north of Archer place and east of Tyndall street. This was intended to serve a warehouse and grain elevator which the petitioners intended to erect and did erect on that plot in the year 1899. It appears that the grain elevator was constructed at a large expense, especially with a view to its use in connection with the siding, and was used in connection therewith, and has had connection with and service from the relator's railroad ever since, although the *point* of connection of the siding with the railroad tracks has been changed several times. After the siding was constructed, a property owner on Archer place instituted a mandamus proceeding to compel the relator to remove it, on the ground that it constituted an illegal structure. The relator filed an answer in that proceeding, reciting, in substance, the facts already stated, and containing an assertion by the relator with respect to its purpose and use as follows: "Said siding was put in and is maintained and operated solely for the convenience of said Adikes (the petitioners herein) and the public who transact business with them, so as to increase the facilities for the receipt and delivery of freight at the storehouse of said Adikes in the village of Jamaica." The application for the writ of mandamus was denied.

In the year 1911 an agreement was made between the city of New York and the relator with respect to the elimination of grade crossings, which contemplated the elevation of the tracks and the passing of the streets under them. This would require a steep grade on the siding to connect with the railroad tracks, or the elevation of the siding; and the relator determined to abandon the siding and all other sidings in the station zone of the improvement at Jamaica on the northerly side of the railroad. It is stated in the brief of the relator that it served a notice on the petitioners in April, 1913, of its intention to remove the siding pursuant to a clause in the agreement under which it was constructed giving the relator the right to terminate the service on 10 days' notice. The petitioners thereupon brought a suit in equity to enjoin the relator from removing the siding, and they succeeded at Special Term; but the judgment was reversed by the Appellate Division. Adikes v. Long Island R. R., 165 App. Div. 221, 151 N. Y. Supp. 49. The decision of the Appellate Division, as shown by the opinion, was placed upon the ground that, as there was no statute regulating the rights of the railroad company and abutting property owners with respect to sidings when a siding was constructed, their rights depended upon their agreement, and that when section 27 of the Public Service Commissions Law became of force on June 6, 1907, it did not become applicable to a siding constructed under an agreement by which for a consideration the railroad company was given the right to terminate the service, as was provided in the agreement with respect to this siding then before the court. The court, in reversing the decision of the Special Term, suggested that an application be made to the Public Service Commission.

Thereupon the petitioners applied to the Public Service Commission, and in their petition set forth the facts with respect to and the circumstances under which the siding was originally constructed and their buildings were erected, the amount of freight business conducted over the siding, the threat of the railroad company to terminate the service, the action brought by them for injunctive relief, and prayed the Commission to determine that the circumstances and business were sufficient to warrant the maintenance of the

siding, and that an order be made requiring the railroad company to construct and maintain the siding. After taking evidence and hearing the parties, the Commission made an order, so far as material to the questions under review, as follows:

"(1) That said the Long Island Railroad Company be and it hereby is directed and required to construct and establish a switch connection between its railroad at Jamaica, in the borough of Queens, city of New York, and a lateral line of railroad or private side track on the property of the petitioners, situated on the east side of Tyndall street, between Fulton street and Archer place, in said borough of Queens; such switch connection to be constructed and established substantially as shown in red on drawing entitled 'Sketch of Proposed Elevated Siding for J. & T. Adikes, Jamaica, L. I. Sketch 1—100 feet January 15, 1915,' which drawing was received in evidence as Exhibit No. 2 on the hearing had in this matter.

"(2) That said company construct and establish such switch connection within six months from and after the service on said company of a certified copy of this order.

"(3) That in so far as the construction and establishment of such switch connection necessitate an encroachment upon or use of the public highway, said company make and prosecute with due diligence application to the proper city authority for such permit or consent as may be necessary for the construction and establishment thereof.

"(4) That this commission hereby specifies and directs that an amount representing the entire cost of the construction and establishment of so much of said switch connection as shall be located upon the petitioners' own property and one-half of the cost of so much of said switch connection as shall be located in, upon, or over any public street or streets as the reasonable compensation for the construction, establishment, and maintenance of said switch connection.

"(5) That said company shall maintain and operate the said track or switch connection now established, maintained, and operated between its line of railroad and the property of the petitioners situated on the east side of Tyndall street, between Fulton street and Archer place at Jamaica, in the borough of Queens, city of New York, until the switch connection herein provided for shall have been constructed and put in operation."

The plan pursuant to which the siding was directed to be reconstructed provides for its elevation, on the lands of the relator and across the junction of Tyndall street and Archer place, and on the lands of the petitioners, to the level of the tracks of the relator, as elevated pursuant to the plan of improvement provided by the contract between the city and the relator.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

Alfred A. Gardner, of New York City (Louis J. Carruthers, of New York City, on the brief), for relator.

George S. Coleman, of New York City (Edward M. Beegan, of New York City, on the brief), for Public Service Commission.

Augustus Van Wyck, of New York City, for interveners.

LAUGHLIN, J. [1] Section 27 of the Public Service Commissions Law, under which the application which resulted in the order under review was made, provides as follows:

Sec. 27. *Switch and side track connections; powers of commissions.*

"1. A railroad corporation, upon the application of any shipper tendering traffic for transportation, shall construct, maintain and operate upon reasonable terms a switch connection or connections with a lateral line of railroad or private side track owned, operated or controlled by such shipper, and shall, upon the application of any shipper, provide upon its own property a side track and switch connection with its line of railroad, whenever such side

track and switch connection is reasonably practicable, can be put in with safety and the business therefor is sufficient to justify the same.

"2. If any railroad corporation shall fail to install or operate any such switch connection with a lateral line of railroad or any such side track and switch connection as aforesaid, after written application therefor had been made to it, any corporation or person interested may present the facts to the Commission having jurisdiction by written petition, and the Commission shall investigate the matter stated in such petition, and give such hearing thereon as it may deem necessary or proper. If the Commission be of opinion that it is safe and practicable to have a connection, substantially as prayed for, established or maintained, and that the business to be done thereon justifies the construction and maintenance thereof, it shall make an order directing the construction and establishment thereof, specifying the reasonable compensation to be paid for the construction, establishment and maintenance thereof, and may in like manner upon the application of the railroad corporation order the discontinuance of such switch connection."

It will be seen from the statement of facts and the order of the Public Service Commission that the siding in question was regarded as an existing "lateral line of railroad or private side track." The order of the Public Service Commission indicates that the Commission regarded the construction which it has directed the relator to make as *a switch connection;* but it is manifest that it has ordered the relator to do more than to make a switch connection with the existing lateral line of railroad or private side track, for it has ordered it to do all the construction work, not merely on its own land, but also across the junction of the streets and on the property of the petitioners, and to obtain any permit, license, or grant that may be required therefor. We find no authority in the statute for the order, in so far as the relator is directed to make application for a permit for the construction of the siding over the public streets, the fee of which is not shown to be owned by it, or on the property of the petitioners. Authorities are cited from other jurisdictions in which it has been held that it is competent for the Legislature to require a railroad to make applications for permits to construct sidings across public streets and to require it to construct sidings, not only across public streets, but on private property; but the statutory provisions before the courts for construction in those cases were much broader than those of our statute. See Union Lime Co. v. Chicago & N. W. Ry. Co., 152 Wis. 633, 140 N. W. 346, affirmed 233 U. S. 211, 34 Sup. Ct. 522, 58 L. Ed. 924; State v. Chicago, M. & St. P. R. Co., 115 Minn. 51, 131 N. W. 859.

The learned counsel for the Public Service Commission, appreciating that the express provisions of section 27 of the Public Service Commissions Law do not authorize the Commission to require the railroad company to do anything beyond the line of its own property, attempts to sustain the action of the Commission under a general provision of section 4 of the Public Service Commissions Law, which reads as follows:

"There shall be a Public Service Commission for each district, and each commission shall possess the powers and duties hereinafter specified, and also all powers necessary or proper to enable it to carry out the purposes of this chapter."

We are of opinion, however, that said section 27, construed in the light of said section 4, does not show that the Legislature intended to

empower the Commission to require the railroad company to do any-thing that could not be done on its own property. The order must therefore be modified by limiting the construction work to be perform-ed by the relator to making the switch connection on its own property with the siding when constructed according to the plan to the line of the property of the relator.

[2] It is further contended by the relator that it is impracticable and unreasonable to require it to maintain a connection with this siding and to furnish the petitioners service thereon. On that point con-siderable evidence was introduced by the relator and by the petitioners, and a question of fact was thereby presented on which the Commis-sion had the benefit of a view by one of the Commissioners, pursuant to section 11 of the Public Service Commissions Law. We have con-sidered the evidence, and are of opinion that we would not be war-ranted in reversing the determination of the Commission that it is feasible and practicable to maintain the switch connection and that the public interests require it.

[3] It is also contended by the relator that this switch connection is sought for a private purpose, and that, in so far as the Legislature has attempted to authorize or require it, the statute is unconstitutional. This contention is mainly based on Union Lime Co. v. Chicago & N. W. Ry. Co., supra, in which it was claimed that a statute of the state of Wisconsin requiring a railroad company to construct and maintain a spur track on the application of an owner of a private industry was unconstitutional. The question arose on the objection of a property owner, whose land the railroad company sought to condemn to enable it to comply with the order of the Commission. The court sustained the statute on the theory that it was not a private use, for, although the construction was required to be made in the first instance to serve the business of a single individual, the statute provided that others might from time to time become entitled to use the spur track on pay-ing a proportionate share of the cost of construction, which in the first instance was required to be borne by the original applicant. There are observations in the opinion indicating that private property could not be taken in invitum for the construction of a *private* siding; but that is not the point decided by the court, for it was found that the spur track was for a public use.

The question presented here under the statute confined by our con-struction to the lands of the relator *is not whether private property may be taken for a private siding,* but whether a railroad chartered under the laws of this state, which is continuing to furnish switch con-nections to some shippers along its line, and where our statute in effect forbids it to discriminate between shippers (section 33, Public Service Commissions Law), may be compelled by the Legislature to continue the service to the petitioners which it voluntarily inaugurated, by requiring it to maintain a switch connection with their siding. The authority of the lawmaking body of the state or nation to compel public service corporations to make connections between their lines, even when this involves the exercise of eminent domain, has been sustained by the courts. Matter of Stillwater & M. St. Ry. Co., 171

N. Y. 589, 64 N. E. 511, 59 L. R. A. 489; Hudson Valley R. Co. v. B. & M. R. R., 106 App. Div. 375, 94 N. Y Supp. 545; Interstate Commerce Commission v. D., L. & W., 216 U. S. 531, 30 Sup. Ct. 415, 54 L. Ed. 605; Grand Trunk Railroad Co. v. Michigan R. R. Co., 231 U. S. 457, 34 Sup. Ct. 152, 58 L. Ed. 310; Michigan Central R. R. v. R. R. Commissioners, 236 U. S. 615, 35 Sup. Ct. 422, 59 L. Ed. 750. It has been held that it is competent for the Legislature under which a railroad is incorporated to regulate and prescribe the facilities it shall furnish for public service including the furnishing of switch connections with private mines and manufacturing plants. Brooklyn Heights R. Co. v. Steers, 213 N. Y. 76, 106 N. E. 919; Clarke v. Blackmar, 47 N. Y. 150; City of Detroit v. Mich. Central R. Co., 156 Mich. 121, 120 N. W. 592; State v. Chicago, M. & St. P. Ry. Co., 115 Minn. 51, 131 N. W. 859; N. Car. Corp. Commission v. Seaboard Air Line Co., 140 N. C. 239, 52 S. E. 941; Hocking Valley R. R. Co. v. N. Y. Coal Co., 217 Fed. 727, 132 C. C. A. 387. See, also, Olanta Coal Co. v. Beach Creek R. R. Co. (C. C.) 144 Fed. 150. In City of Detroit v. Mich. Central R. Co., supra, the court said:

"Aside from constitutional or statutory requirements, the relation between manufacturers and railroad companies as to the construction and maintenance of side tracks rests entirely in contract. But for the interests and rights of the third party interested, the relation between shipper and carrier would rest entirely in the hands of those two parties, and be governed entirely by the contracts which they might choose to make; but the third party, the public, is interested, and therefore has certain rights which it may enforce through the government. Among these is the right to regulate and prescribe, to some extent, the facilities which railroad corporations must furnish for the transportation of the products and produce of the country. Among these is the right to compel switch connections with the plants of manufacturers whenever, as stated by the learned counsel for the Car & Foundry Company, 'such connection is reasonably practicable and can be put in with safety, and the manufacturer will furnish sufficient business to warrant it.' Hence Act No. 312, Pub. Acts 1907, § 6a, and 34 U. S. Stat. p. 584. * * * These acts only provide that, if the parties more directly concerned cannot make satisfactory arrangements for such connections, the Railroad Commissions may be appealed to and the railroad companies compelled to install such tracks upon reasonable terms and conditions, and also maintain them. Chicago, etc., R. Co. v. Suffern, 129 Ill. 274 [21 N. E. 824]."

[4] Although, so far as appears, the business conducted by the petitioners is their own, still, in their relations with the railroad company, they are transacting a very extensive business, for they are buying and storing the products of others, and shipping them over the railroad of the relator, and it appears that these shipments aggregate between 400 and 500 carloads a year, and it is conceded by the relator that they are among the largest shippers on its railroad. So far as appears, no right has been acquired by others for the use of this siding; but for aught that appears the siding may be extended. The present contention of the relator is diametrically opposed to its contention in opposition to the application for mandamus to compel it to remove the siding, for at that time it took the position that this was a public use.

[5] It must be left to the petitioners, however, to obtain any permit from the public authorities for the construction of the siding, in accordance with the plan approved by the Public Service Commission, to

the line of the railroad property and to elevate the siding to the line of the railroad property, at their own expense. As a basis, however, for obtaining any consent that may be required of the public authorities, it was, I think, within the jurisdiction of the Public Service Commission to entertain the application, and to determine in advance that the relator should be required to make the switch connection.

It follows that the order should be annulled, without costs, and the matter remitted to the Public Service Commission, with authority to make an order limiting the construction required to be made by the relator to the construction of the switch connection and side track to the line of its property, to connect with the siding of the petitioners when constructed to the line of the relator's property, in accordance with the plan approved by the Commission, and in its discretion to require the relator to maintain the connection with the siding as it now exists until the siding is elevated in accordance with the plan approved by the Commission. Settle order on notice. All concur.